The next case for oral argument this morning is Mielo v. Heinzl v. Steakn Shake Operations, Inc. Mielo v. Steakn Shake Thank you, Chief Judge Smith, Your Honors. It pleases the Court, my name is David Raisman. I'm here on behalf of Pellant S&S Steakn Shake Operations and ask to reserve two minutes for rebuttal. Granted. Mr. Raisman, let me begin by, well, first of all requesting that you order your argument by first addressing the question of standing and then going on to the Rule 23 issues, if you would please. And in asking that, I note that in your briefing, while you've argued a lack of standing, you've done so in the context here of a Rule 23 certification process, rather than by way of a motion to dismiss or some dispositive motion. I just, it's not the order of battle I would ordinarily expect, but would request in any event that you begin with standing here and then go on to the other. Your Honor, with respect to the procedural posture, I think the Court's aware that standing is an issue that has to be taken up at any time. Right. It was only after the depositions of the plaintiffs that we feel we had enough evidence to provide for standing and then the motion for certification was upon us. And for that reason, we moved ahead and included it there. You needed discovery for purposes of your standing issue. Well, we didn't think the complaint established it, but case law has taught us that it's better to get the evidence. And, Your Honor, after having the evidence, and I apologize for my voice that's suffering today, but after having the evidence, we know that the plaintiffs here have established only a single instance, each of having experienced any barriers, and that's only on their own allegation without any support from an expert that was actually a violation of the law. And you say they failed a deterrent test, right? Well, they certainly haven't alleged that they were deterred or offered any evidence of deterrence in their declarations. We looked for it, Your Honor. They also didn't show that they'd been back to any locations. Well, but I'm not sure they have to go back. I mean, that's what I want to press you on. I mean, isn't it enough if they go and it's not accessible, they're deterred from going back. They don't have to express a desire to go back to a place that failed to accommodate them, do they? Your Honor, I think Lou Jan requires that someday intentions are not good enough. They actually would have to prove the deterrent effect that they're saying, I'm deterred from going back. I believe Your Honor's question says that we're allowed to infer that from the barrier. Yes. That's not the case. I mean, Your Honors, I handle hundreds of these. And plaintiffs frequently go and patronize different places of public accommodation and go back to those places. Let me add that there's no evidence here. Some do and some don't may be factually correct. However, we have two representative plaintiffs in this action. Yes. And our standing inquiry is limited to them, right, under our jurisprudence. Yes. Well, I ask that both of you, both you and Mr. Coppella, address this question as I'm asking it. And I want to make sure I understand this correctly. If I understand plaintiffs' standing position correctly, it's this. With respect to injury and fact, that is experiencing improper slopes at two locations. This would be legally protected, concrete, particularized, actual or eminent. That would be step one of the standing inquiry. And that is the causation that the improper slopes that existed there are caused by deficient post-construction and maintenance policies. And then third, the regressibility aspect that the improper slopes can be regressed by instituting a new policy to ensure that the slopes are sought out and corrected. That's my understanding of their theory on standing, and Mr. Coppella will correct me if I'm wrong. If that's it, though, why isn't it enough? Why isn't that enough for purposes of showing standing? Your Honor, I think if I just focus on the second issue, I'm not going to take issue with the injury and fact, their deposition state, that they went there and they experienced the problem. They've not backed that up, by the way, with showing a violation of Title III. That was just their experience. No evidence showing an actual violation of anything in this case. Isn't their experience evidence? Their experience is evidence that there's a slope, Your Honor, but every person with a disability has a varying degree of disability and different equipment that they use. Every person may experience a slope without a problem. I've seen very vigorous people who do triathlons and things like that who can handle a slope, and others may have difficulty. That's why the standards set up a standard for what that slope must be, albeit arbitrary, because it's going to include some people with disabilities, and it's also going to exclude others. But these plaintiffs said they had difficulty with the slope. That's evidence, isn't it? It is absolutely evidence, Your Honor, but it doesn't establish a violation. I'd like to skip to the move to the second issue, which is whether it was caused by these maintenance policies, because I think that has overarching significance as well in the commonality area. And that is the way they've shown any causation here, if they've shown any at all, is by finding particular areas of nonconformance. I emphasize nonconformance, not violation. That's how you violate the ADA, right? Nonconformance may be. It's the first step to establishing a violation. Nonconformance with the Act or its regulations, not nonconformance with some policy. Correct. That's your position. That is my position, Your Honor. In addition, showing nonconformance doesn't tell us whether there's a problem with the policy, whether there was a problem at the time of new construction, whether there was a problem at the time of alteration, whether there was a problem in deciding whether that alteration was done to the maximal extent feasible, whether it was readily achievable. Is there some overlap in your argument on that causation prong to a standing and the commonality issue that exists here? Yes, Your Honor. Absolutely. I think it's central to both, although there's alternative arguments to both. There's no connection between plaintiff's injuries and any policy because it could be anything, and they've made no effort to prove which of the many problems it could be it was, and I would reiterate that there is any problem at all. Redressability in theory, Your Honor, this case is redressable by what a California district court described as bone crunching analysis over 400 locations with respect to each feature of each of those locations. So, yes, it's theoretically redressable, but through lots and lots of factual findings. Let me jump ahead to a statutory question, Mr. Reisman, because you've raised it. You argued that Section 211 is limited in its application, that it was intended to apply to machines and equipment rather than to parking spaces and sidewalks. And I think the language of Section 211 refers to both facilities and equipment. Wouldn't parking lots fall under the term facilities? Yes, Your Honor. We tried to clarify this in our reply brief, that we were trying to argue what the Department of Justice was aiming at with respect to this, and all of the regulatory history points to the same thing. But you concede the point at this point. I concede that it certainly applies to other facilities. What it does not do is create an obligation to have a maintenance policy. Let me ask my colleagues if they have any more questions on standing before we move to the Rule 23 issues. So let's in fact do so. Do you concede that your client indeed has common maintenance policies that apply to all your store locations? Yes, Your Honor. There are certainly some commonalities. There's a group of service technicians that are part of that policy. There's, I believe, somewhere in the range of 50, I apologize, that obviously exercise some discretion as to how they do it. You've seen the checklist, perhaps, that's included in the record. That checklist does call for folks to go through and exercise some discretion. There's also the operations team doing this on a quarterly basis, and they have their own checklist, which is also made part of the record. But as a general matter, the things that Steak and Shake does in order to address, to find and address accessibility nonconformance is something that is a practice, at least. Go ahead. Let me ask you a hypothetical. Assume that your policy said that Steak and Shake will plow snow from the parking lots it maintains only after at least six inches accumulate on the ground. Would you concede that a policy like that would be suitable for class action, perhaps not nationwide, but at least with respect to all Steak and Shake stores, maybe not apply to your stores in Florida, but at least to stores where snow falls? This spring, I think it might apply to stores in Florida. Your Honors, I think this is the ho-hider decision in the sense that the mere establishment of a policy isn't enough. I'm not talking policy in the abstract. I'm giving you a policy. That's why I gave you the specifics. The policy says do not plow the parking lot unless at least six inches of snow falls. Would that be amenable to a class action of the type that they're seeking to pursue here? Your Honor, I, of course, would like to give it more thought than I've been given at this point, but I don't think so because I think there's, again, going to be a whole series of individualized circumstances. For example, individuals that use electric or motorized wheelchairs will have no difficulty. Getting through six inches of snow? Correct. I can say from personal experience I've seen that. In any event, there are individualized questions. If your construction specifications provided for counters or tables that were at least six feet high, that's not amenable to a nationwide class? What I'm trying to get at is isn't it possible that there would be some policy that a national chain such as yours could establish that would just on its face be amenable to proof by a class of disabled individuals that this is, you know, this is not accommodating me under the ADA? Your Honor, that's certainly possible in the classes that have been certified. Most of the classes that have been certified can be described in that way. A design policy that's wrong. Now, I think it's. All right, then let's look to what we're really dealing with here. Why is your actual policy not amenable to that sort of nationwide proof, commonality, et cetera? Because there is no proof, again, connecting the policy. One of the reasons is that there is no proof connecting the policy to any violations or that the violations reflect a problematic policy. So really it's the idiosyncratic nature of each parking lot and also the varying degrees of disability or challenge that disabled individuals face when navigating your parking lot. I think more the former, some the latter, but more importantly for procedural purposes under Rule 23, resolving that issue of the policy does nothing to resolve the issues that are actually at stake in the case. That is, does each nonconforming feature in each parking lot, over 400 of them, violate Title III? We have no proof whatsoever in any of these cases that that has happened. Well, and let me take that a step further, if I may. Plaintiff's own complaint lists, I believe, several different ways in which the ADA can be violated with respect to parking facilities. And I think you've pointed that out in your briefing as well, as a basis to defeat any commonality showing. But what if the class were restricted to ADA slope violations alone? Forget, put aside the seven listed areas in the amended complaint. What if the district court had defined a class based upon just slope violations? Again, I would fall back on the argument, which I think follows from Hoheider. Again, there is a policy there of not engaging in the interactive process and doing lots of different things with respect to reasonable accommodations. The policy itself does not create the common question. In Hoheider, the court is going to still have to go through each of UPS's decisions about reasonable accommodation as to each individual and each individual's request to determine if they were in fact lawful or not. And we believe the same would be true here. So, no, I don't think having just the slope issue do that would work. I'd point out here that they haven't shown either that slope measurement is required. The DOJ guidance that's published in this area that talks about the maintenance of facilities and specifically as a checklist with respect to the maintenance of parking lots, talks about the two things that you need to do in a parking lot. One is to keep them clear of object obstructions, snow, debris, mud. And the other is to look for cracks in the surface or lack of smoothness. All those are things that are specifically reflected in the checklist. Don't the accessibility standards identify the appropriate slope? They do. And by the way, Plaintiff's investigator, to the extent he proved anything, found that several of the slopes he identified as violative also were within construction tolerances under the very same standards, 104.1.1. So if the class has defined that all the parking lots have to conform to the accessibility standards, what would you make of that? I would say that's a comply with the law injunction. Terribly from an administrative perspective, but also specifically prohibited by Rule 65. And I realize my time is up. Thank you. Let me just take the proposed limited class one step further. What if it were limited to slope violations to the eight scores that are at issue here? Again, Your Honor, I don't think they've shown a failing of policy or practice. And with respect to the additional six that the plaintiffs didn't go to, those six were never visited by anyone, there's no evidence, other than the investigator who, of course, does not have Title III standing. With respect to one of the locations, Your Honor, it's actually a leased facility, which is a fact also in the record, one of the two that they did visit, and one where Steak and Shake does not operate the parking lot. But again, we would still end up having to litigate the issues on an individual basis. We'd have a much more manageable time of doing it, though, Your Honor. One final question. Of course. And this really is applicable to your commonality position primarily, but I think it probably has some applicability beyond that. Have you argued specifically that the ultimate result would be here, procedurally, a series of mini-trials to resolve on a site-by-site basis the violations that you maintain need to be demonstrated? Correct. The policy is irrelevant, actually. We would be skipping right to the same issues where we're going location-by-location to determine viability, which would also apply to a slope class or slope subclass, Your Honor. Thank you very much, Mr. Reisman. Mr. Kilpella.  My name is Ed Kilpella, and I represent plaintiffs in the certified class. Mr. Kilpella, you have elected to forego claims against Steak and Shake here, seeking remedies for a variety of specific ADA violations at certain locations, and instead asking for a uniform policy that would apply to all Steak and Shakes. Why? And in addition to that why, explain also why Walmart versus Dukes doesn't present some problems to you, given the policy-bound nature of your argument here. Certainly, Your Honor. Taking the first part of your question first, as I should probably do, why the policy is at issue in this litigation is based on the way the discovery came out during the discovery in the district court proceedings. Before we filed our lawsuit, as the Court is aware, we had two named plaintiffs who had experienced, personally, barriers to entry at two different Steak and Shake restaurants. We conducted a pre-suit investigation that showed that those barriers appeared to exist at not just those restaurants, and we filed our lawsuit alleging a class action. During discovery, we discovered that Steak and Shake employs a common policy. It has a set of employees that are in charge of maintenance at its restaurants. Those employees are centrally trained and are provided a checklist that they use when they inspect each and every of Steak and Shake's more than 400 locations across the country. And those employees receive no training regarding the ADA guidelines. So what? What if, is it your argument that, let's assume they had no policy, or let's assume the policy is five times as bad as you believe it to be now. If your clients showed up at Steak and Shake and the slope was perfect and everything else was in perfect compliance with the ADA, is it your argument that there would be an ADA violation because of the inadequacies of the policy? The policy in that case, Your Honor, whatever it is, appears to be working. And the requirement of the ADA isn't that a company have a certain policy or a policy at all. The requirement of the ADA is that there's a maintenance site. So it doesn't have to be a policy. It doesn't have to be a policy. What we're really dealing with, I think, is are these facilities ADA compliant or not, right? So you could have a great policy, the best policy in the world, and I assume you would not concede that that insulates a business like Steak and Shake from an ADA case, right? It doesn't insulate Steak and Shake from an ADA case about a location that is out of compliance. It would insulate Steak and Shake from an ADA case about modification of a policy. The ADA provides several different forms of relief that are available. One is, as the Court just sort of alluded to, an injunction requiring a defendant to take certain repairs at a location. The other type of relief that can be obtained is the modification of a policy. And in this case, we feel that the modification of a policy will provide relief not just to the main plaintiffs, in this case, who visited individual Steak and Shake restaurants, but to a broad class of plaintiffs who. . . It all depends on what they do with the policy, right? I mean, you know, a lot of firms have sexual harassment policies that people don't follow. I mean, policy is only as good as the people that perform it, right? As a matter of fact, I asked you about Walmart versus Dukes, and it was stated in the opinion, the majority opinion, that Walmart had such a nondiscrimination policy, and yet this lawsuit went forward on a national basis. But the issue in Walmart, Judge Smith, is one of discretion, and we believe that's the distinguishing factor between what's at issue in Walmart and what was at issue in Walmart and what is at issue here. Here, there is no discretion with regard to how the policy is applied to Steak and Shake's locations. And more fundamentally, the ADA standards that need to be maintained are not discretionary. They are very concrete standards that are used in construction, and that we believe should be applied in maintenance as well. Does your theory of liability come down to whether the regulatory language that requires an entity, your Steak and Shake, to maintain its facilities, then requires Steak and Shake to seek out violations in the first place? Your Honor, what our case is about is there's a maintenance obligation that needs to be discharged in some form or fashion. And Steak and Shake has chosen to openly into the lap of the court and not suggest, since your theory is not based upon actual ADA violations, but the failure to have a policy or the belief that a policy here ought to be required, shouldn't you be providing something specific? With regard to what sort of? What sort of policy? And we discussed this in our complaint and also in our briefing, your Honor. What a policy would look like, of course, would be subject to refinement by the district courts. It's a very fact-bound inquiry. But at the very least, the following three things would be part of any policy amendment. The people charged with maintaining, conducting the maintenance inspections at defendant's facilities should require the requisite, would be required to obtain training. By whom? By, I'm just going to reference a settlement we did in a similar case, and that was approved by the district court without objection after notice was provided to disability rights groups. A third-party expert in ADA accessibility guidelines was brought in to create a training process to add on to an already existing inspection process, an ADA compliance component. And then a video was, in fact, made to facilitate that training. And then counsel for plaintiffs in this case, my law firm, obtains reports about how that process is going, what sorts of violations have been unearthed during that process, and what steps the company is taking or is not taking to remediate them based on what was found. And what were some of the examples? What did the trainers teach them in that case? In that case, Your Honor, I referenced the settlement agreement, which was public. The trainer created a detailed set of steps so that, for example, for a parking lot slope and path of access slope, a laser level was provided to all of the maintenance technicians in that case, and the maintenance technicians were trained on a periodic basis. They do an annual inspection, comprehensive inspection, to use that laser level to evaluate the slopes in the parking spaces, the slopes in the path of access. Do those lasers have to be used in parts of the country that are perfectly flat? It's my experience, Your Honor, that there is no such thing as perfectly flat anywhere, even in Kansas. But it was a nationwide. There are no parking lots in the country that have a zero slope? I'm sure there are. And then the lasers have to be used on those? The lasers are used at every one of the facilities of the defendant. What else? There was training regarding accessibility guidelines, and not just in the parking lots and paths of access, but other accessibility guidelines that were made part of the inspection process. And then also a training video was done. And then the expert who was retained by the company had some oversight of that process as it was implemented to make sure it was going properly and was making reports to the court and plaintiff's counsel as well. I can't say that would be the perfect solution here, because in that case we are, of course, working with that company's already existing process, and a similar process would occur. Let me move on to the other Rule 23 issues that are at stake here. The defendant has raised the issue of numerosity, and that your numerosity showing is not sufficient. I would go only so far as to say it's pretty thin. You provide us with one statistic and ask us to rely on common sense. The latter is something that hopefully we are not devoid of and don't ignore in the process, but we've got to extrapolate from something. We've got to infer from something. Tell me why that's enough here, and why you didn't do more since you were in discovery, inquiring into use by all customers of various stores and, in particular, parking areas. First part, why is this enough? Why didn't you do further discovery? Sure. With regard to the last question you asked, Judge Smith, I did it during 30B6 deposition testimony. A defendant conceded they don't track in any way the number of persons with disabilities of any sort that visit their facilities. Even if they don't, I mean, we have Amici in this case. Surely there are trade organizations out there to which you might have recourse in terms of getting data on general use of the facilities and frequency of use of those facilities by disabled customers and the use of parking facilities attendant to those establishments. That would be a possibility, would it not? I mean, you have to concede here, I think, that the numerosity question isn't resolved the way it might have been 30 years ago. It ain't enough to just establish an allegation in the face of a complaint. And since hydrogen peroxide numerosity is up for grabs the same way the other three, subsection A, requisites are, right? Yes, Your Honor. And this court, and I believe it was Hayes v. Walmart, a third circuit case, said that when analyzing numerosity a court can consider circumstantial evidence and then if enough of that has been presented move on to using common sense. And I think the court district court did just that. There are between 15 and 20 million Americans with mobility disabilities. The defendant has more than 400 restaurants and defendant's corporate designee during his testimony conceded that he was certain that thousands of people with mobility disabilities visit their stores each year. What percentage of the 400 restaurants have slopes that are out of compliance with the ADA? I don't know the answer to that question right now, Your Honor. So they might all be in compliance except the two that your clients visited? They might be. And that goes to the issue of commonality a little bit that I'll get back to you. Doesn't that sort of scream out for further study required before you just certify a class? And isn't it true that the district court erred when it said the following, when doubt exists concerning certification of the class, the court should err in favor of allowing the case to proceed? That's not good law, right? I apologize. I didn't mean to interrupt, Your Honor. No. I think that phrase is possibly in conflict with jurisprudence post-Dukes. But I think subsequent to that phrase, the court referenced the applicable standard of a rigorous analysis. And, in fact, in finding that each element of Rule 23A and Rule 23B2 had been met, conducted a rigorous analysis with reference to the record. Turning back to numerosity. Shouldn't we be troubled by the fact that that citation, that reference, appears front and center in the district court's analysis? I mean, if there remains confusion out there about the extent to which a probing and rigorous analysis is to be conducted, shouldn't we be somewhat concerned about the rest of the analysis here by the district court? Your Honor, Judge Smith, I think the district court's opinion demonstrates that, despite that sentence, a rigorous analysis with numerous references to the record had been done. And I don't think reversing on the use of that sentence would be appropriate, given the standard that's applied and the abuse of discretion. So you agree, of course, that it's not the law that we should err on the side of certification where there's some question and you don't believe that the court's ruling or opinion as a whole is undermined by its reference to Eisenberg versus Gagne. Yes, Your Honor. That's our position. Turning back quickly to your question about numerosity, if you don't mind, Judge Smith, I'd like to draw not attention, but Rule 23B2, the advisory committee notes, state that B2 classes are often amorphous and incapable of specific enumeration. And that's what this case is about. This is an injunctive relief class. So we might be talking about future users for purposes of quantifying numerosity in ways that we would not be looking at that in a B3 act. Precisely, Your Honor. There are people who have a mobility disability now that have never seen a stake-and-shake but might be driving by one one day and want to go. That's the nature of going to stake-and-shake. And I'm fortunate. I can pull my car off the road and go. And the ADA and the relief we're looking for is the guarantee that people with mobility disabilities can make that same decision, whether they know they are going to now or people that haven't suffered a mobility disability yet. Let's get to commonality because that really is at the heart of the Rule 23 part of this case. And I've reread a number of times the class definition. It refers to parking facilities. But would you agree that the class, if you read this class definition very carefully, isn't strictly limited to members who were harmed at those parking facilities? No, Your Honor. I believe the way I read it is it's people that were harmed by virtue of the policy that applies to those parking facilities. And with regard to the commonality question, that's really the tension between the argument advanced by stake-and-shake and what we're arguing. Stake-and-shake is trying to focus this point. So you don't think that this definition would extend to accessibility barriers, for example, that exist in a bathroom of a stake-and-shake? I can see how you're reading it that way, Your Honor. That's why I'd like you to answer the question. I can see that I've studied philosophy in college, and I know things can be read multiple ways. I remember you telling me that one time. But let's avoid the metaphysics and get back to the definition. Absolutely. I think the way the class is described and has been certified is it is a class of individuals with mobility disabilities, like our plaintiffs, who have been harmed by the common policy. To the extent a fix of that policy provides relief to a group of persons beyond the class or with experiences beyond our class, that's... And your theory of the case is if you get a settlement like you have in the other one and they get training and they get videos, then there won't be any more problems at any of the 400 restaurants. Our theory of the case, Your Honor, is that this case, we're focused on the cause. We believe that the cause, and we will have to prove this, of course, below, or we will lose proving it and Steak and Shake will have res judicata on this issue as applied to all 400 restaurants. There's an efficiency built into the way this case is postured. We believe this case is about a common policy that uniformly leads to discrimination at appellate restaurants. And I guess I would challenge you on that with my hypothetical that I asked your adversary. I mean, if it's a design defect, if they have a policy that has a height of tables, of something in the bathroom, a foot of snow, six inches of snow in the parking lot, it's easy to extrapolate using common sense, I think, that that would... It's a non-starter for people with mobility disabilities, right? But we don't have that here. We've got this sort of policy that... Or maybe a policy that would work on the slope issue. Let's say their design guide said that if you're in a hilly part of the country, you can have, you know, eight inches of slope in the parking lot, right? I mean, that's a non-starter for people in wheelchairs, right? Absolutely. But here we've just got this sort of policy that doesn't have any of those sort of categorically unaccommodating features, right? What we have is a policy that has a bunch of maintenance guys that go around and are supposed to maintain these parking lots. And as I understand it, you're saying, well, on some occasions they don't maintain the parking lots. And that sounds like a good case for the individual people who come upon violative parking lots. But I'm having trouble understanding how we can extrapolate that writ large across 400 stores for people with myriad types of mobility issues. Understood, Your Honor. And I think the hypothetical just draws a distinction between the underlying requirement under the ADA and the policy. So in your hypothetical, the requirement is a very sort of specific one-issue requirement, the requirement to remove snow, right, and a policy that says we're not going to do that. And so the policy and the ADA standard to which it's applied seem to be married quite neatly. The maintenance obligation under Rule 211, the DOJ has said in its guidance in 2008, applies to all accessible features. So the requirement is somewhat broader, admittedly, than a single requirement about removing snow, but the requirement is there in the regulations that has been interpreted by the Department of Justice to require a comprehensive, you know, it's a comprehensive maintenance obligation so that you don't have to be there at the ribbon-cutting ceremonies if you're in a wheelchair to benefit from the ADA's requirements and so that a facility that's 15 years old needs to be maintained so that people that are there on day one have the same accessibility as people that are there on day 3,450. But what is it about this policy that says don't worry about maintaining parking lots? It seems to say the opposite. It seems to be a debate here about the quality of their maintenance, not whether they're endeavoring to maintain. What the policy doesn't do, Your Honor. The people that are tasked with executing the policy don't have the requisite training. In fact, they have no training regarding the ADA. The checklist they use has absolutely no ADA component part to it. And so as a result, the only process Stake and Shake uses to assess its facilities doesn't do anything to carry out the maintenance obligation from Section 211 that is unambiguous in the DOJ history. It applies to everything. And we believe we can prove in subsequent proceedings that there are a host of problems at Stake and Shake restaurants that flow directly from this policy. And if we can prove that, then we can have the court craft an injunction of a remedy. That's close to what I was about to ask you. And it is to return to the basis of the question I asked Mr. Reisman. And that is your own complaint lists seven different types of ADA violations. And here's where I think Dukes may have its application for this matter. Because Dukes laid down a requirement that a plaintiff, and this is the language, demonstrate that the class members have suffered the same injury. That was very important to the majority's analysis. And you've alleged parking space slopes, access aisle slopes, cross slope of route to facility entrance, lack of proper parking signage, lack of proper van accessible signage, improper mounting of accessible parking signage, curb, ramp, slope. Doesn't that, on its face, create commonality problems? No, Your Honor, because all of those flow from the common policy. And this court in Baby Neal considered the question of certification of a B-2 class where a myriad of state and federal policies were being misapplied to a dispersed group of individuals with various disabilities. And the court found that the fact that the different policies would result in different injuries to different people wasn't the question. The question is, were there common policies? Baby Neal was well before, well, well before Walmart versus Dukes. Judge Becker's opinion in that case. So you can't use that to say we don't look for the same injury. No, no. I don't think you can, Your Honor. I think Baby Neal remains good law because the injury at issue in Baby Neal that survives even a post-Dukes analysis is, is there a policy that is subject to modification by a court that would remediate the injuries to a class of plaintiffs, even if those. Even if the injuries are not common. Even if the injuries are not common. The common policy is the gravamen of our case and the gravamen of the analysis under B-2. So whether or not there is, whether or not Steak and Shake in this case, the defendant under Rule B-2, has acted or refused to act in a manner that applies broadly to the class represented. In this case, the manner in which they have crafted and applied their policy affects the members of the class they represent equally. I've been well on time now. This will be my last question, I promise. My colleagues may have more. I've referred to these various ADA violations. No, it won't be my last question. I have one last wrap-up that Mr. Reisman may want to address as well. With these various violations, don't you have a problem satisfying Rule 23 B-2's requirement that final injunctive relief be appropriate, respecting the class as a whole? Without, at the same time, asking the district court to issue an impermissibly broad injunction that's nothing more than the ADA. No, Your Honor. I believe that what we're, the position that Steak and Shake has taken is that we construct our facilities in compliance with the ADA, and then after that we'll remediate if a member of the disabled community lets us know about a problem. Steak and Shake isn't saying they're not subject to the various requirements about slopes and paths of access. They're just saying that they shouldn't be required to look for whether or not there are violations. And an injunction could be crafted in this case that simply requires that they modify their already existing policy to do just that, to identify these ADA issues as they arise and to take steps to remediate them consistent with their obligations under the ADA. And I think that could be crafted in a way. How often do they have to look? Your Honor, I would, it would depend on how, what discovery beneath will occur in the future shows. In other cases, we have, again, I hate to keep referencing Cracker Barrel where we did this, but it was on an annual basis. The maintenance obligation is the courts. So as long as they look every year, there won't be any ADA violations? That sounds like not much protection for the disabled community. Your Honor, the maintenance obligation under Section 211 has built within it an exception for reasonable interruptions in service. So, for example, if accessible lift that allows a person in a wheelchair to bypass a set of stairs, if that, that's going to break. Things break all the time. But as long as you get it back into service within a reasonable amount of time or identify the issue and remediate it within a reasonable amount of time, then there is no violation of the maintenance requirement. And so here, given that, you know, what tends to happen with parking services is they tend to move and shift during certain periods of the year. Freeze and thaw, right? We all live in Pittsburgh. We know what potholes are. Well, I live in Pittsburgh. I know some of the panel members now. Potholes occur. We know when they occur. New potholes don't happen in July. They happen in March and April as the freeze-thaw process happens. So there are an annual basis is a good proxy to measure the parking lots. It also doesn't make the injunction unreasonable. It allows the process defendant already has in place to be modified on a reasonable basis. But instead of not looking for these violations until they remodel a facility 15, perhaps 20 years after it was built, it gets a good hard look once a year or perhaps more frequently depending on what the evidence that will be developed shows, but it's certainly better than never looking at it at all. Okay, this is the last question from me, I promise. It's an appellate procedure question, really. We have before us a 23-F appeal, so it goes to nothing but the certification order. We have three options here depending upon how we resolve the standing and Rule 23 issues. We can affirm the district court, and then the district court will go forward with the class action. We could grant the relief that the appellant suggests, and that would be to decertify the class. That's what they want. That's certainly not what you want. Do we have a third option of remanding to the district court with some instructions as to how, despite infirmities in the class as certified, it might be possible to certify a more narrow class based upon geographic location, number of stores, perhaps other issues? Is that conceivable? That third option is absolutely available to this Court, and as you're well aware, Your Honor, this Court has done precisely that in other 23-F appeals. We, of course, believe that the district court's opinion and the manner in which this policy is applied to all its stores nationwide justifies certification of the class as it stands. Thank you, Mr. Cooper. Thank you very much. Mr. Reason. Thank you, Your Honors. I'll try to be as brief as I can here, and I know I only have two minutes. I'd first like to address an underlying issue to make sure there's no confusion. While the ADA standards are clear and certain, that does not equate with the violation of the law. Even as plaintiffs allege in their complaint, and this picks up on Chief Judge Smith, your questions about the different kinds of violations they found at the locations. They actually allege in Paragraph 8 of their complaint, and this is the Joint Appendix 87 and 88, that defendants are required to remove barriers when it's readily achievable to do so, a different basis other than the maintenance obligation that they attest to. In the alternative, there's been an alteration to the place of accommodation. They're required to the maximum extent feasible to do that, and then they go on to cite new construction. So even in their complaint, they're identifying different ways other than the so-called policy issue that they believe they've identified to do that. I want to point out with respect to the policy, Dukes is pretty clear that there's two ways to bridge the conceptual gap between an alleged policy and significant proof of discrimination. And I don't think the plaintiffs or the district court have come close to doing that here. What Dukes also makes clear in lots of other decisions since then, including the Third Circuit, is it's not just the mere allegation of a policy or that it's causing discrimination is going to be good enough. That was done in Dukes. They tried to assert that there were policies and practices. In Hoheider, there was good evidence. This court recognized that not doing an interactive process is probably going to lead to some problems in not granting reasonable accommodations. With respect to the maintenance regulation that they assert here, you have the same problem. You have to bridge the gap, and there's two ways to do it. A biased policy, as Judge Hardiman's question suggests, there's numerous ways to do that. And we have policies to identify issues. And secondly, Walmart says that you can bridge it by showing significant proof of discrimination, which I think I've already made clear and our briefing makes clear it's not there. The plaintiffs and the district court here are suggesting that we can go ahead and find the common issue. The district court even said in its ruling that they've shown enough at this juncture to produce common questions and answers with respect to when we've investigated the policy. But that's not enough. The Robinson v. National City Bank court made clear that you have to show on class certification that there's such a common issue for adjudication. Thank the court for your patience. Thank you very much, Mr. Reisman, Mr. Capella, for very helpful arguments in this matter. It occurs to me there's a disclosure that I should make, but by no means do I think that it gives rise to any serious concern. I was alerted this morning to the fact that two of my law clerks visited a Steak and Shake last evening, but it was not for purposes of doing any kind of investigation of their own. They'd be thoroughly incapable of that, I'm sure. They tried out a shake, which got good grades, and they tried out a burger, and I'll remain agnostic on how they felt about the burger. But I just thought I should mention that to you because they reported it to me. Thank you. Thank you very much, gentlemen. We'll take the matter under advisement. I ask the clerk to adjourn the proceeding.